UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DENNIS C. RIEMER,

                    Plaintiff,

          v.                                        Case No. 17-C-1425

NANCY A. BERRYHILL,

                    Defendant.

## DECISION AND ORDER REVERSING COMMISSIONER'S DECISION

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Dennis Riemer's application for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act. For the reasons set forth below, the Commissioner's decision will be reversed and remanded for further proceedings.

## BACKGROUND

Riemer filed applications for disability and DIB on June 5, 2013, with an alleged onset date of June 2, 2012, due to life-long Crohn's disease; an ileostomy, which resulted in him losing his large intestine and part of his small intestine; bouts of low sodium and dehydration; acute kidney failure; and a history of alcohol and drug abuse. R. 15, 78.

### A. Riemer's Medical Conditions

Riemer has suffered from Crohn's disease since he was approximately 18 years old. R. 78, 685. In 2011, his Crohn's disease grew so severe that he had a complete resection of his anus, rectum, colon, and part of his terminal ileum. R. 691. As a result, Riemer was required to use an ileostomy bag, a bag that connects to an opening in the abdomen and collects fecal matter directly.

*Id.* Riemer has also struggled with alcohol and drug abuse for decades, resulting in his hospitalization. R. 306–08, 1057.

After the 2011 surgery, Riemer struggled to manage his Crohn's disease. He experienced high ileostomy outputs and suffered from vitamin and mineral absorption issues, such as hyponatremia, a condition that causes low concentrations of sodium within the blood. R. 522–25, 528–29. Riemer was hospitalized several times in 2012 and 2013 for dehydration and electrolyte imbalance. R. 382–86, 405–07, 411–12, 425, 528–29, 639, 652–54, 656, 720–40. During this time, Riemer began seeing Dr. Butkiewicz to help him manage his Crohn's disease and presented to Fox Valley Nephrology for his acute renal failure with hyponatremia and metabolic acidosis. R. 370, 522–25. Dr. Butkiewicz prescribed Riemer codeine to slow the ileostomy output and placed him on a high-sodium diet to help maintain his electrolytes. R. 357, 509–11. The codeine proved effective and slowed the ileostomy output. R. 522–25. However, in September 2013, Riemer had a positive drug test in violation of the narcotics contract he signed with Dr. Butkiewicz, which resulted in Riemer's termination from Dr. Butkiewicz' care. R. 669.

Beginning in May 2014, Riemer saw Advanced Practice Nurse Prescriber (APNP) Raquel Molepske and Dr. Joseph Kim regarding Crohn's disease management. R. 825–27, 857–61. Riemer reported that, while he was on codeine, he would empty his ileostomy bag approximately five times a day. R. 858. Since being released from Dr. Butkiewicz' care, he was no longer taking codeine and now emptied his ileostomy bag at least fifteen times a day. *Id.* Dr. Kim performed an esophagogastroduodenoscopy (EGD), which revealed moderate to severe Crohn's activity. R. 836. Dr. Kim increased Riemer's azathioprine, an immunosuppressive medication, and prescribed him prednisone, a steroid used for suppressing the immune system. Riemer reported moderate

2

improvements, in that he emptied his ileostomy bag eleven times a day rather than fifteen. R. 1014. However, on June 25, Riemer was hospitalized for an "episode of abnormal involuntary movement," which doctors believed was caused by Riemer's alcohol use and anxiety. R. 780–805.

Over the rest of the summer, Riemer received treatment for mental health issues. On June 29, Riemer was committed to Norwood Health Center pursuant to Wisconsin Statute § 51.15 for nearly two weeks after expressing suicidal ideation. R. 1032–33. On July 11, the same day he was released from Norwood, Riemer was hospitalized again for a suspected panic attack. R. 741. On, July 23, Riemer presented to the emergency room for alcohol use and anxiety. R. 754. On July 29, Riemer was admitted to the hospital after meeting with Molepske for electrolyte abnormalities and to receive a psychiatry consultation. At the consultation, Riemer was diagnosed with depression and anxiety. R. 838–40, 842, 845, 863–64. On August 4, Riemer was admitted to the hospital after attempting to commit suicide by overdosing on pills. R. 807. Riemer suspected his mental health issues were caused by the prednisone,[1] which he ultimately stopped taking. R. 863, 1002.

In the fall of 2014, Riemer saw Molepske in an attempt to gain control over his Crohn's disease. At the time, he continued to experience high output from his ileostomy bag and had to empty it at least ten times a day. R. 1002. Riemer tried Humira, a biologic therapy, but he found it provided minimal relief, as he was required to empty the bag approximately ten to twelve times a day. R. 869–74, 975, 983. In February 2015, Dr. Kim performed an ileoscopy, which revealed mild to moderate Crohn's activities. R. 854. On May 4, 2015, Dr. Kim wrote a letter explaining that

---

[1] Prednisone, a corticosteroid, is known to have mental-health side effects. *See* E. Sherwood Brown, Ph.D., M.D. and Patricia A. Chandler, M.D., *Mood and Cognitive Changes During Systemic Corticosteroid Therapy*, Prim. Care Companion J. Clin. Psychiatry 17–21 (Feb. 2001), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC181154/ .

"[Riemer] continues to be in a state of poor control with his Crohn's disease." R. 1024. Dr. Kim noted that

> [b]ecause of his high volume ostomy output, he has to very cautiously and meticulously avoid dehydration . . . [and] he continues to have aggressive high volume output which necessitates that he drinks specific amounts of water and electrolytes solution just to maintain his hydration. He has to empty his ileostomy bag nearly 15 times per day because of his Crohn's activity and his health status. Keeping track of his fluid and electrolyte balance, his need of nutrition and fluids alone is a full-time job and there is no doubt in my mind he will not be able to sustain any type of reasonable work because of these health issues.

R. 1024–25.

Dr. Kim and APNP Molepske continued to treat Riemer throughout 2015 and attempted to control his Crohn's disease and ileostomy output. Riemer reported that he emptied his ileostomy bag between seven to ten times a day. R. 901–05, 909, 913, 918–22, 925, 937–41, 945–49, 952, 963. Although the amount of times Riemer emptied the bag had decreased, Dr. Kim and APNP Molepske continued to characterize his output as "high volume." R. 901–05, 925. Riemer also reported occasional abdominal pain and dehydration issues. R. 913, 937–41, 945–49. Additionally, there was evidence of continued inflammation and moderate Crohn's disease, despite the medication he took to manage his condition. R. 880, 933, 1105. In September 2015, Dr. Kim and APNP Molepske decided that Humira did not sufficiently control Riemer's disease and attempted another course of treatment. As of January 2016, Riemer continued to suffer from moderate Crohn's disease activity, experienced bloating and abdominal pain, and emptied his ileostomy bag seven to eight times per day. R. 879, 903.

## B. Riemer's Disability Proceedings

On June 5, 2013, Riemer, then 51 years old, filed a Title II application for disability and DIB, alleging disability beginning on June 2, 2012. R. 15. On October 23, 2013, Dr. Barbara Cochran,

a state agency reviewing physician, reviewed Riemer's medical documents through September 19, 2013. R. 78–84. Dr. Cochran found that while Riemer had chronic renal failure and inflammatory bowel disease, neither condition was severe because Riemer's Crohn's disease appeared stable and his kidney function had improved. R. 82–83, 90. She therefore determined Riemer was not disabled. R. 83. Riemer's application for disability was subsequently denied on October 30, 2013. R. 15.

Upon reconsideration, Drs. William Bolz and David Biscardi completed another evaluation of Riemer's medical records on March 3, 2014. This included a review of Riemer's medical records through February 6, 2014. R. 87. Dr. Biscardi noted that Riemer admitted a history of prior panic attacks and anxiety but noted that there was "no medically determinable mental impairment" at that time and did not have a mental health evaluation performed. R. 90–92. Dr. Bolz found both Riemer's inflammatory bowel disease and chronic renal failure to be severe. R. 91. He determined Riemer had the physical residual functional capacity (RFC) to perform medium work, with a restriction that he should avoid concentrated exposure to vibrations and should be limited to working in areas close to bathroom facilities. R. 94–95. Because Dr. Bolz determined Riemer could engage in other work, Riemer was found to not be disabled. R. 96. Riemer's request for reconsideration was denied on March 6, 2014. R. 15.

Riemer requested a hearing and on July 1, 2016, Administrative Law Judge (ALJ) Joseph G. Hajjar held a video hearing with Riemer, his attorney, and an impartial vocational expert (VE), Thomas Nimberger. R. 15. At the time of the hearing, Riemer was 5'10" and weighed 200 pounds. R. 41. Riemer testified that he had been unable to work since 2012, which coincides with his termination from Waupaca Foundry. R. 43. He explained that he cannot work because he gets dehydrated frequently and has kidney failure, resulting in hospitalizations. R. 47. Riemer claimed

he cannot exert himself without needing to rest every ten minutes and needs to empty his ileostomy bag at least every other hour, or approximately twelve times a day. R. 48–49. He reported that his doctors recently found evidence of Crohn's, which requires that he undergo intravenous therapy every other month. R. 53. Riemer also noted that he sees Dr. Patel, a psychiatrist, for his anxiety. R. 51.

A VE also testified at the hearing. R. 67. The ALJ presented a situation to the VE involving a hypothetical individual of Riemer's age, education, and past employment, who was limited to medium exertional work and who had several limitations, including that he

> can tolerate only frequent exposure to dust, odors, fumes, and pulmonary irritants and only occasional exposure to vibrations. Moreover, this person needs to have access to drinks, such as bottled water or Gatorade, to remain hydrated while working. However, this individual can never work in an environment where toxic chemicals, things like paint thinners, acetones, and chemicals of that nature, that if consumed are likely to cause death or serious physical harm are used in the work area or where the consumption of drinks during work is prohibited due to the nature of the work.

R. 67–68. The VE found that there were several jobs that the hypothetical individual could perform, including a clean up worker with national job numbers of 105,000, a packager with national job numbers of 82,000 at the medium level and 89,000 at the light level, a dietary aide with national job numbers of 49,000, a cashier with national job numbers of 200,000, and a mail clerk with national job numbers of 83,000. R. 69–70. Riemer's attorney questioned whether the VE's sources, such as the Dictionary of Occupational Titles (DOT), contained information about whether the job titles and job numbers he proposed had chemicals or hazardous materials present. R. 71. The VE responded:

> That would be as true as they may not be. I'm sure that there are government agencies that track such types of issues, especially the Environmental Protection

Agency and Workers' Comp. arenas, most of them have a safety and (INAUDIBLE) division, maybe they carry some kind of database, maybe insurance companies do. The DOT definitely does not and I've never accessed any of those databases, if they exist.

R. 71–72. The ALJ then sought to clarify:

Of the jobs that you've identified . . . are there any toxic chemicals, I think it was acetone and chemicals that if consumed would cause death or serious physical harm used in the work area of those employees for them to perform their jobs that you've identified, are there any of those hazardous materials in the work area for them to confuse their drinks with . . . their food or whatever it is with those items?

R. 73. The VE responded, "No," and the attorney objected that the VE had admitted he did not have that knowledge from either the DOT or his work experience. *Id*. The ALJ responded:

That wasn't your question; your question was if those are used in those jobs, and my question to him [was whether] those chemicals and hazardous materials are things that are used by the employee to perform their jobs or that are within their, those employees' work area, that was my question. And that was the intent of my hypothetical to begin with.

R. 74.

After the hearing, the ALJ issued his decision on July 19, 2016. R. 15–28. He found Riemer's Crohn's disease and chronic renal failure to be severe impairments but determined Riemer's weight, specifically the fact that he was overweight, and pulmonary function were not severe. R. 17–18. He also concluded Riemer did not have any mental impairments which could cause more than minimal limitations when considered either singly or in combination. *Id*. In particular, the ALJ found that the "record does not document any episodes of decompensation, which have been extended in duration." *Id*. He found support for this determination from Dr. Biscardi, who completed a psychiatric review on March 5, 2014, and found no episodes of decompensation. *Id*. The ALJ gave great weight to Dr. Biscardi's opinion. *Id*. The ALJ did note that Riemer was

hospitalized "for complaints of panic attack-like symptoms in July 2014, but it was determined to be a reaction to prednisone, which was discontinued." R. 19. For support, the ALJ cited to Molepske's GI follow up examination notes, which explained that Riemer had missed his previously scheduled appointments due to his emergency room visit for anxiety. R. 982–83. The ALJ does not, however, reference any of the medical records showing Riemer's various hospitalizations for his mental health needs, such as his suicidal ideation or suicide attempt. The ALJ ultimately found Riemer's depression to be no more than a mild impairment. R. 20.

Next, the ALJ found at step three of the disability determination process that Riemer's impairments, or combination of impairments, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. Specifically, the ALJ found that Riemer's history of Crohn's disease did not equal any of the listings under sections 5.06, 5.07, or 5.08 and his kidney disease did not equal any of the listings under 6.02, 6.03, 6.04, 6.06, or 6.09 because he did not have the requisite ailments as listed in each of those sections. *Id*.

After finding Riemer did not have an impairment that met or medically equaled a listing, the ALJ turned to Riemer's RFC. The ALJ found that Riemer had the RFC

> to perform medium work as defined in 20 C.F.R. 404.1567(c), subject to the following limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop; frequently kneel, occasionally crouch; never crawl; frequent exposure to dust, odors, fumes, and pulmonary irritants; occasional exposure to vibration; in addition to normal breaks, off task 10% of the time in an 8-hour workday; the individual needs to have access to drinks (such as bottled water or Gatorade) to remain hydrated while working; and the individual can never work in an environment where toxic chemicals (i.e., paint thinners, acetones, and chemicals of that nature that if consumed are likely to cause death or serious physical harm) are used in the work area, or where the consumption of such drinks (bottled water or Gatorade) during work is prohibited due to the nature of the work. Additionally, the consumption of beverages will not render the individual off-task.

8

*Id*. The ALJ found Riemer's testimony about the intensity, persistence, and limiting effects of his symptoms to be not fully supported by the record. He noted Riemer only visited the emergency room for dehydration when he also had alcohol-related issues and that his dehydration was under relatively good control. R. 21–22. He explained further that, since Riemer began seeing Dr. Kim and APNP Molepske, his Crohn's disease had been better managed and that he had to empty his bag less frequently, from over fifteen times a day to only seven or eight times a day. R. 22–23. The ALJ also noted that the most recent ileoscopy showed "only moderate Crohn's activity." R. 23.

The ALJ gave great weight to the opinions of Drs. Cochran and Bolz, the state agency physicians. R. 24. The ALJ gave the greatest weight to Dr. Bolz' opinion, reasoning that it was supported by objective signs and findings in the preponderance of the record, and "essentially adopted Dr. Bolz's assessment for medium work." *Id*. The ALJ recognized that the majority of Riemer's records regarding the frequency with which Riemer was required to empty his ileostomy bag were created after Dr. Bolz offered his medical opinion, the ALJ added a 10% off-task limitation to compensate for Riemer's most recent reports that he needed to empty his ileostomy bag eight to nine times a day. *Id*.

The ALJ found that Dr. Kim's medical opinions were not entitled to controlling or deferential weight, despite Dr. Kim being Riemer's treating gastroenterologist. R. 24–25. The ALJ gave Dr. Kim's assessment that Riemer was disabled and struggled to maintain his hydration and electrolyte balances little weight because he found it to be "unsupported by objective signs and findings in the preponderance of the record." R. 25. The ALJ then found that Riemer could perform his previous work as a "production assembler," based on how it is generally performed or, alternatively, he could perform other jobs, such as packager, dietary aide, cashier, or mail clerk, which were all found in

9

significant numbers in the national economy.  R. 27–28.  Based on these findings, the ALJ concluded that Riemer was not disabled.  R. 28.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence.  42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).  Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811.  The ALJ must provide a "logical bridge" between the evidence and conclusions.  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination.  Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Riemer raises several challenges to the ALJ's decision, but the court finds one dispositive; and, since remand is necessary in any event, the remaining challenge is likely moot.  Riemer argues

that the ALJ erred at step three in determining which of his medical impairments was severe and whether his severe impairments met or medically equaled one of the listings. Stated another way, Riemer argues that the ALJ's step three determination is not supported by substantial evidence. The court agrees.

The ALJ's determination of Riemer's impairments at step three is flawed in two main respects. First, the ALJ relies on outdated medical determinations by the state agency doctors, which were performed in October 2013 and March 2014. Because of this, neither state agency physician had the bulk of Riemer's medical records. They did not have the 126 pages of Dr. Kim and APNP Molepske's treatment records for Riemer, which began in May of 2014, or any of the records from Riemer's suicide attempts, which occurred in June, July, and August of 2014. Recent Seventh Circuit decisions have explained that it is error for an ALJ to "rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment"); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding after ALJ failed to submit new MRI to medical scrutiny)); *see also Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) (holding the ALJ erred in crediting the state-agency opinions, which were outdated and missing approximately 70 pages of medical records). Here, the ALJ gave great weight to Dr. Bolz' opinions and explicitly stated that he "essentially adopted" Dr. Bolz' assessment of Riemer's Crohn's disease and, subsequently, his functionality with said disease. R. 25. But Dr. Bolz did not have access to any of Dr. Kim's medical records, which indicate that Riemer's Crohn's disease was not well managed and

was not responsive to the various treatment options being utilized. There is no indication whether Dr. Bolz, who reviewed records reflecting that Riemer's disease was reasonably managed while he was on codeine and his ileostomy output was decreased, would assess his functional capacity in the same manner if he had access to Dr. Kim's medical records which showed that Riemer's Crohn's disease was no longer well-managed and he had a high ileostomy output.

Even more concerning is the ALJ's adoption of the state agency doctor's evaluation of Riemer's mental impairments. The ALJ found that Riemer did not have a significant mental health impairment and that he had no episodes of decompensation. R. 18. In doing so, the ALJ gave great weight to Dr. Biscardi, who reviewed Riemer's medical records on March 3, 2014, before Riemer was hospitalized for multiple suicide attempts. *Id*. The ALJ noted that Riemer was hospitalized multiple times for alcohol-related issues and mentioned, briefly, that Riemer was hospitalized for "complaints of panic attack-like symptoms in July 2014, but this was determined to be an adverse reaction to Prednisone, which was discontinued." *Id*. The ALJ does not discuss Riemer's two-week stay at Norwood Health Center from late-June into mid-July 2014 for suicidal ideation and does not mention Riemer's admission to Mercy Medical Center in August 2014 for attempted suicide. Instead, the ALJ relies on the mental health determination of a state agency doctor who assessed Riemer before either of these events occurred. In doing so, the ALJ erred.

The Commissioner argues that the ALJ did not abuse his discretion in determining not to obtain an updated medical opinion because pursuant to SSR 96-6p,[2] an updated opinion was only required when, in the opinion of the ALJ, additional medical evidence received "may change the

---

[2] SSR 96-6p was rescinded and replaced effective March 27, 2017. But because the ALJ's decision was rendered prior to that date, the court cites to the regulations in effect at that time unless otherwise noted.

State agency medical or psychological consultant's findings." Because the ALJ did not request updated medical opinions, the Commissioner contends, it thus follows that the ALJ believed the additional medical records would not have changed the state agency doctor's determinations.

A similar argument was rejected in *Akin*, where the court characterized such a conclusion by the ALJ as "playing doctor." 887 F.3d at 317. There, the court held that the ALJ erred in relying on the opinion of a state agency consultant who had reviewed the file but before about 70 pages of additional medical reports, including MRI results, became part of the record. *Id.* The ALJ had not sought an updated medical opinion from the state agency consultants, and instead stated that "the MRI results were 'consistent' with Akin's impairments and then based his assessment of her residual functional capacity 'after considering ... the recent MRIs.'" *Id.* The court found this argument unpersuasive, noting that "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." *Id.* Explaining further, the court stated:

> The MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion. The ALJ had many options to avoid this error; for example, he could have sought an updated medical opinion. *See Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). But because the ALJ impermissibly interpreted the MRI results himself, we vacate the judgment and remand this case to the agency.

*Id.* at 317–18.

The same reasoning applies here. The ALJ "played doctor," in the words of the Court of Appeals, in at least two impermissible ways. First, the ALJ improperly determined that Riemer's Crohn's disease, acute renal failure, and dehydration were well-managed, contrary to his treating physician's testimony, simply because Riemer was emptying his ileostomy bag half as frequently as

13

he had been originally and had not recently been hospitalized for dehydration. Riemer's ileostomy output may support the ALJ's determination or it may corroborate Riemer's complaints, as Dr. Kim's letter suggests; however, either way, the ALJ was not qualified to make his own determination as to the severity of Riemer's Crohn's disease without the benefit of an updated expert opinion, which analyzed the importance of those additional medical records. *Id*. The ALJ also erred in determining that Riemer's July 2014 psychiatric hospitalization for panic attack-like symptoms, which is separate and distinct from his hospitalizations for suicidal ideation and attempted suicide, was merely an adverse reaction from Prednisone without any further expert examination. The ALJ was not qualified to make his own determination of Riemer's mental health status without the benefit of an expert opinion, especially considering these hospitalizations resulted in Riemer being diagnosed with both anxiety and depression. Because the ALJ relied on outdated medical opinions that were based on a medical record that lacked important evidence of more recent developments, the ALJ's reasoning was flawed and fails to provide the logical bridge needed to support his conclusions. The Commissioner's decision must therefore be reversed and the case remanded for further proceedings.

Because the case must be remanded for further proceedings, the court will briefly address another argument advanced by Riemer: he asserts that the ALJ's step five analysis is not supported by substantial evidence. Specifically, Riemer challenges whether substantial evidence supported the ALJ's determination that there were jobs of a substantial number in the national economy that Riemer could perform based on his RFC as determined by the ALJ. Riemer notes that the ALJ limited Riemer's ability to work to environments where toxic chemicals were not involved and where the consumption of beverages during work is not prohibited. In response to the question whether

14

any of the jobs or number of jobs the VE identified would be eliminated because toxic chemicals were present, the VE responded:

> *That would be as true as they may not be.*  I'm sure that there are government agencies that track such types of issues, especially the Environmental Protection Agency and Workers' Comp. arenas, most of them have a safety and (INAUDIBLE) division, maybe they carry some kind of database, maybe insurance companies do. *The DOT definitely does not and I've never accessed any of those databases, if they exist.*

R. 71–72 (emphasis added).  Given this testimony, it is difficult to regard the VE's opinion as reliable.  The ALJ nevertheless concluded that the additional toxic chemical restriction would not affect any of the job numbers the VE quoted.

In a recent case, the Seventh Circuit found error in accepting a VE's challenged job number estimates without holding the VE accountable for his estimates.  In *Chavez v. Berryhill*, the VE offered two very different estimates at step five for the type of job the claimant could perform—800 or 108,000—depending on which database the VE used. 895 F.3d 962 (7th Cir. 2018).  The VE did not explain why his estimates, or the methods used to produce them, were reliable.  He simply reached his conclusion through the process of elimination.  The court explained that the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method.  In discussing the estimation methodology used by the VE, the court explained that "[w]hat is entirely lacking is any testimony from the VE explaining why he had a reasonable degree of confidence in his estimates . . . ." *Id*. at 969.  The court also explained that the VE was required to give "[a]n affirmative explanation for the estimate he produced . . . for without one there was no evidentiary foundation on which the ALJ could rest a finding of reliability." *Id*.

Similarly, the VE in Riemer's hearing provided job number estimates, in which he hypothesized that it was just as likely as not that there would be toxic chemicals used in those work environments, even though the RFC included a limitation for working in such environments. The VE gave no explanation for his estimate and explained that he was not sure if there was data on that sort of information. If there was, he conceded he did not access it. There was apparently no basis on which the ALJ could find the VE's numbers reliable. Upon remand, the ALJ should develop an evidentiary foundation for any such similar determinations.

## CONCLUSION

For the reasons above, the Commissioner's decision is **REVERSED and REMANDED** to the Agency pursuant to 42 U.S.C. § 405(g) (sentence four). The Clerk is directed to enter judgment forthwith.

Dated this   26th   day of September, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court